**Petition for Writ of Mandamus Conditionally Granted and Opinion filed July 30, 2019.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-18-00466-CV**

---

**IN RE EDWARD ALEXANDER, ADAM JOHNSON, WAYNE THOMPSON, JR., LILYNN CUTRER, AND KAREN AUCOIN, INDIVIDUALLY AND AS CO-TRUSTEES, Relators**

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**Probate Court No. 4**
**Harris County, Texas**
**Trial Court Cause Nos. 365,053 & 365,053-404**

---

## OPINION

Relators Edward Alexander, Adam Johnson, Wayne Thompson, Jr., Lilynn Cutrer, and Karen Aucoin, Individually and as Co-Trustees filed a petition for writ of mandamus in this court.  *See* Tex. Gov't Code Ann. § 22.221; *see also* Tex. R.

App. P. 52. By a separate filing, relator Elaine T. Marshall joined in the petition. In the petition, relators ask this court to compel the Honorable James Horowitz, presiding judge of Probate Court No. 4 of Harris County, to vacate his May 2, 2019 order granting the motion to compel production filed by real party in interest Preston Marshall.[1] We conditionally grant the petition.

## I. BACKGROUND

E. Pierce Marshall, Sr. created the Harrier Trust, of which Preston Marshall is the income and principal beneficiary, and the Falcon Trust, of which Preston is the initial income beneficiary and his children are the successor income and principal beneficiaries. Elaine T. Marshall was named the original trustee for both the Harrier Trust and Falcon Trust (the "Trusts"). Elaine appointed relators Alexander, Johnson, Thompson, Cutrer, and Aucoin as Co-Trustees of the Trusts in December 2016 (the "Co-Trustees"). On January 11, 2017, Elaine sought a declaratory judgment in the Fourteenth District Court, Calcasieu Parish, Louisiana ("Louisiana Court") to approve the appointment of the Co-Trustees of the Harrier Trust (the "Louisiana Action").

---

[1] When relators filed this original proceeding, the judge of Probate Court No. 4 of Harris County was the Honorable Christine Butts. Judge Butts signed a June 5, 2018 order, which was the subject of this proceeding when filed. Judge Butts ceased to hold office of Judge of Probate Court No. 4 on January 1, 2019. We abated this original proceeding to permit her successor, Judge Horwitz, to reconsider Judge Butts's June 5, 2018 ruling. On May 2, 2019, Judge Horowitz signed the order, which denied reconsideration and granted the same relief Judge Butts granted in her June 5, 2018 order. We now consider whether relators are entitled to mandamus relief as to Judge Horowitz's order.

2

On September 29, 2017, Preston filed suit against Elaine and the Co-Trustees in Probate Court No. 4 of Harris County, alleging that they had breached their fiduciary duties (the "Texas Action"). In short, Preston alleged that Elaine violated her fiduciary duties as trustee by executing documents appointing the Co-Trustees when those documents violated the Trusts' terms. Further, Preston alleged that the Co-Trustees violated fiduciary duties because they agreed with Elaine to withhold distributions from Preston, which increased the trustees' compensation.

Preston subsequently took the deposition of Co-Trustee Adam Johnson in the Louisiana Action. In his deposition, Johnson testified that he understood that Elaine had sole discretion on some issues for a certain period of time, though he could not recall which issues or the time period. He thought one of the issues may have been accumulation of income. He believed he came to that understanding from a document he believed he and others signed. Specifically, he stated the following:

Q. Was it your understanding subsequent to the acceptances that all of you did in Exhibit 2, was it your understanding that Mrs. Marshall could no longer act alone as a trustee?

A. No, I don't think that was my understanding.

Q. So you thought she could go ahead and act as a trustee on her own without any concurrence from the other co-trustees?

\* \* \*

A. My understanding is that she could — she had sole discretion on — on some issues.

\* \* \*

3

Q.  What issues?

A. I recall there being some understanding that there was going to be a period of time where we were going to be essentially, you know, learning so that we weren't . . . . I don't know whether or not she could — "discretion" and "act" are two different things, I guess.  Could she act alone?  I believe — I recall thinking that we were — trustees as a group, that decisions would be made as a group.

Q.  Well, you said there were certain areas that you understood in which she would have sole discretion.  What were those areas?

A.  I can't specifically recall the areas.  I think one of them might have been accumulation.

Q.  Whether to accumulate or distribute income?

A.  Right.

Q.  And how did you come by that understanding that for a period of time she would have sole discretion on that issue?

A.  It was in a — I believe it was in a document.

Q.  And so when you met for the first quarterly meeting of the trustees after you had been appointed, it was your belief that Mrs. Marshall had sole discretion over whether to make distributions to Preston Marshall?

A.  Yes, for a period of time.

Q.  What was the period of time?

A.  I don't specifically recall.  It might have — I don't specifically recall it.

Q.  You said it was in a document.  Did it require your agreement or unanimous consent of the trustees that she would have that discretion for a period of time?

4

A. I think it required our agreement.

Q. And do you recall executing a unanimous consent to that effect?

A. I believe we executed a document related to that effect.

* * *

Q. Did you execute the document?

A. I think I did. I think I did, yes.

* * *

Q. Do you recall when the period of time would end?

A. I think — I recall maybe 18 months, maybe. But I can't recall that specifically. I think its 18 months, but I'm not a hundred percent sure.

* * *

Q. Did you retain a copy of the document for your own records?

A. I believe so, yes.

According to Preston, Johnson and two other Co-Trustees, Karen Aucoin and Wayne Thompson, also testified that the Co-Trustees in fact did not vote on whether to make distributions to Preston. Preston claims the document to which Johnson referred is relevant to his allegations that relators breached their fiduciary duties.

In both the Louisiana Action and the Texas Action, Preston served requests for production, which sought among other things production of the document Johnson mentioned in his deposition. As relevant here, Preston requested from Elaine and the Co-Trustees in the Texas Action:

5

> All documents that exist or have ever existed signed by one or more of the Co-Trustees any portion of which gives or gave Mrs. Marshall any rights, power, or authority regarding distributions of funds or accumulation of funds or other assets in the Harrier Trust or Falcon Trust for any period of time, or any other special rights concerning the Harrier or Falcon Trusts; and

> At his deposition taken on November 21, 2017 in In Re: Harrier Trust, Docket No. 2016-3020, Div. F - 14th JDC, Parish of Calcasieu, State of Louisiana (attached as Exhibit B), Adam P. Johnson testified to the existence of an executed document at Tr. 57:19 - 60:25. Please produce that document.

Elaine and the Co-Trustees objected to the production of the requested documents because the requests called for information protected by the attorney-client and work-product privileges. They stated that the requests sought draft documents and documents that never became effective, as well as attorney-client communications regarding draft documents.

Preston filed in the Texas Action a motion to compel, a renewed motion to compel, and a motion to compel in camera inspection of the documents at issue. The Co-Trustees filed responses. The Co-Trustees submitted the affidavit of attorney Edwin F. Hunter, III. Hunter testified that he and his firm Hunter, Hunter, and Sonnier, LLC ("HHS"), had provided legal services to Elaine from April 8, 2010 to the present, including in her capacity as Trustee of the Trusts. *See* Tex. Prop. Code Ann. § 113.018(a) ("A trustee may employ attorneys . . . reasonably necessary in the administration of the trust estate."). Hunter also testified that he and HHS provided legal services to the Co-Trustees "on various topics" starting in December 2016 to the present. Hunter stated that "HHS formed mental impressions and opinions

6

regarding various issues on which the trustees requested HHS advise them in their capacities as trustees." Hunter further attested that, in HHS's capacity as counsel for Elaine and the Co-Trustees, the firm assisted with various tasks and advised them on several topics related to their duties as trustees of the Trusts. Some of these discussions, Hunter stated, "may have related to the rights, powers, and authority regarding distribution of funds or accumulation of funds or other assets in the Harrier or Falcon Trust. At times, HHS may have prepared for the trustees' consideration work product drafts related to their duties as trustees." Hunter stated that all documents prepared in connection with providing the legal services described are work-product and subject to "all applicable privileges." We quote further from Hunter's affidavit:

> 10. There has never been a document transferring rights, powers, or authority regarding distribution of funds or accumulation of funds or other assets in the Harrier or Falcon Trust for any time, or any other special rights concerning the Harrier or Falcon Trusts executed by Mrs. Marshall and the co-trustees. If such transfer of authority was ever contemplated or documents or agreements drafted evidencing any contemplated transfer of authority, that information would be privileged and undiscoverable as "work product." No such transfer of authority was ever effectuated, and no documents or agreements related to any contemplated transfer of authority were ever executed. Again, any draft documents are protected "work product" or intended for consideration by any of the trustees as an attorney-client communication.

> 11. At all times Mrs. Marshall and the co-trustees expected that HHS would keep all communications, legal advice, work-product, and opinions confidential. Mrs. Marshall and the co-trustees entrusted HHS with sensitive information that, as I understand it, they wish to refrain from making public. HHS's duty to preserve both applicable privileges

7

and confidences is absolute, and HHS has not been authorized to deviate from its ethical responsibilities to Mrs. Marshall and the co-trustees in any capacity, including as a trustee of or donor to any trust or foundation.

At a May 24, 2018 hearing on Preston's motions, the trial court instructed Elaine and the Co-Trustees to provide the court copies of the subject documents for in camera review, which they did. In the meantime, on May 26, 2018, the Co-Trustees filed a Motion for Protective Order in the Louisiana Action. The Louisiana Court heard the matter on May 30, 2018, and at the conclusion of the hearing, requested a copy of the documents. The Louisiana Court reviewed the documents in camera and, on June 1, 2018, issued a protective order, finding that the documents are drafts of an agreement and ruling that the preliminary drafts are protected by the attorney-client privilege. Subsequently, the Co-Trustees provided a copy of the Louisiana court's protective order to the judge in the Texas Action. On June 5, 2018, the trial court in the Texas Action signed an order granting Preston's renewed motion to compel and overruling Elaine's and the Co-Trustee's objections. The court specifically ordered Elaine and the Co-Trustees to produce to Preston documents responsive to the two requests for production quoted above. Respondent's May 2, 2019 order grants the same relief and specifically orders Elaine and the Co-Trustees to produce all the documents submitted in camera.

Relators filed this original proceeding requesting that we order the trial court to set aside its June 5, 2018—now the May 2, 2019—order directing relators to produce documents responsive to specific requests for production. Relators assert that the trial court abused its discretion because the draft documents are protected by

8

attorney-client and attorney work product privileges. Relators also contend that they do not have an adequate remedy by appeal from the trial court's order because error in directing them to produce privileged materials cannot be cured on appeal.

## II. MANDAMUS STANDARD OF REVIEW

Ordinarily, to be entitled to a writ of mandamus, relators must show that the trial court clearly abused its discretion, and that they lack an adequate remedy by appeal. *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (original proceeding) (per curiam). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re H.E.B. Grocery Co., L.P.*, 492 S.W.3d 300, 302–03 (Tex. 2016) (orig. proceeding) (per curiam); *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). The scope of discovery is within the discretion of the trial court. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 698 (Tex. 2015) (orig. proceeding). Appeal is not an adequate remedy when the trial court has erroneously ordered the production of privileged documents. *In re Silver*, 540 S.W.3d 530, 538 (Tex. 2018) (orig. proceeding).

## III. ANALYSIS

### A. Abuse of Discretion

1. *Applicable law*

Confidential communications between client and counsel made to facilitate legal services are generally insulated from disclosure. *See* Tex. R. Evid. 503(b); *In*

9

*re XL Specialty Ins. Co.*, 373 S.W.3d 46, 49 (Tex. 2012) (orig. proceeding). This rule "promotes free discourse between attorney and client, which advances the effective administration of justice." *XL Specialty Ins. Co.*, 373 S.W.3d at 49; *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 160 (Tex. 1993). The Supreme Court of Texas has discussed the different variations of the privileges protecting confidential communications applicable in multi-party litigation in Texas. *XL Specialty Ins. Co.*, 373 S.W.3d at 49–53. One such privilege, the "joint client" or "co-client" doctrine, applies in Texas "[w]hen the same attorney simultaneously represents two or more clients on the same matter." *Id*. at 50. "Joint representation is permitted when all clients consent and there is no substantial risk that the lawyer's representation of one client would be materially adversely affected by the lawyer's duties to the other." *Id.* (citing 2 Restatement (Third) of the Law Governing Lawyers § 128 (2000)). "'Where [an] attorney acts as counsel for two parties, communications made to the attorney for the purpose of facilitating the rendition of legal services to the clients are privileged, except in a controversy between the clients.'" *Id.* (quoting *In re JDN Real Estate-McKinney L.P.*, 211 S.W.3d 907, 922 (Tex. App.—Dallas 2006, [mand. denied])).

2. *Relators established that the requested documents come within the scope of the privilege*

In opposing production of the requested documents on the grounds that they are protected communications, relators were required to show that the documents are among those protected by the attorney-client privilege. *See id.* at 53–55 (stating relator failed in its burden to make required showing); *In re Russo*, 550 S.W.3d 782,

10

789 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding) (party asserting privilege has burden of proof). The party asserting the privilege may establish a prima facie case for the privilege by testimony or affidavit. *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding). "The prima facie standard requires only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam) (internal quotation marks & citation omitted). The documents themselves may constitute sufficient prima facie evidence of attorney-client privilege. *Weisel Enters., Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex. 1986) (orig. proceeding) (per curiam).

Hunter's affidavit establishes that Hunter and HHS have represented the Co-Trustees and Elaine in an attorney-client capacity on matters related to relators' duties concerning the Trusts. The affidavit establishes further that the documents at issue were created during HHS's joint representation and for the purpose of rendering legal services to Elaine and the Co-Trustees in their capacities as trustees. Hunter states that HHS was never authorized to waive any privileges. There are no assertions or evidence that any controversies exist among any of the relators. *See XL Specialty Ins. Co.*, 373 S.W.3d at 50. Because HHS simultaneously represents all relators on the same matter, we conclude that the joint client doctrine applies here.

We next consider whether relators demonstrated that the requested documents come within the scope of the privilege. Hunter stated in his affidavit that HHS had discussions with Elaine and the Co-Trustees, which "may have related to the rights,

11

powers, and authority regarding distribution of funds or accumulation of funds or other assets in the Harrier or Falcon Trust." Hunter explained that although a transfer of certain authority to Elaine may have been contemplated, an agreement to that effect was never signed by all Co-Trustees and Elaine. At times, he said, HHS "may have prepared for the trustees' consideration work product drafts related to their duties as trustees" but any drafts of such a contemplated agreement were communicated to HHS's joint clients for the purpose of facilitating the rendition of legal services and are privileged.

Generally, matters of strategy discussed between client and counsel are privileged. *See* Tex. R. Evid. 503(b)(1); Tex. R. Civ. P. 192.5(a); *General Motors Corp. v. Gayle*, 951 S.W.2d 469, 474 (Tex. 1997); *In re AEP Tex. Cent. Co.*, 128 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, orig. proceeding). In this vein, draft agreements and documents may be protected by the attorney-client privilege. *See Muller v. Walt Disney Prods.*, 871 F. Supp. 678, 682 (S.D.N.Y. 1994) (holding that preliminary drafts of agreement were protected by attorney-privilege because they contained client confidences and legal advice and there was no indication that they had been disclosed to third parties); *In re City of Dickinson*, 568 S.W.3d 642, 646 (Tex. 2019) (orig. proceeding) (holding that emails exchanged between attorney and client's employee and accompanying drafts of affidavit were privileged); *In re ExxonMobil Corp.*, 97 S.W.3d 353, 364–65 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (holding transmittal memos from attorney to client's employees discussing draft agreements were privileged); *In re Toyota Motor Corp.*, 94 S.W.3d 819, 826 (Tex. App.—San Antonio 2002, orig. proceeding) (holding that draft

12

reports, which were sent to relator's attorneys by relator's representatives for review and comment, were factual information contained in privileged communications and were thus privileged); *In re Monsanto Co.*, 998 S.W.2d 917, 931 (Tex. App.—Waco 1999, orig. proceeding) (holding that drafts of patent applications and letters to EPA, which were sent to attorneys for review and comment, were privileged).

Although Johnson testified that he believed he signed a document that he recalled purported to give Elaine sole discretion over accumulation and distribution of funds to Preston, the Co-Trustees contend that no binding agreement exists because Elaine never executed any such agreement. The Co-Trustees maintain that no agreements materialized between them and Elaine for Elaine to have sole authority over income accumulation or distribution to Preston. The record supports this argument. We have reviewed copies of the responsive documents, which were submitted to the trial court and to this court in camera. Based on our review, we conclude they constitute attorney-client communications between HHS and the Co-Trustees and come within the scope of the joint client privilege doctrine. Moreover, Co-Trustee Edward Alexander testified that, from the time that he was appointed as Co-Trustee until he was sued in this case, Elaine never asked him to allow her to make decisions regarding distributions to Preston. Thompson further testified that he never delegated authority to Elaine to make decisions concerning distributions to Preston. Relators have met their burden in showing that the responsive documents are privileged.

Preston contends that the attorney-client privilege does not protect the requested documents here, even though communications between a trustee and a

13

lawyer can be protected by the attorney-client privilege. *See Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996). Preston cites *Huie* for its statements that "a trustee's duty of full disclosure extends to all material facts affecting the beneficiaries' rights" and that "[a]pplying the attorney-client privilege does not limit this duty." *Id.* Preston argues that the material fact that the Co-Trustees delegated authority to Elaine cannot be privileged, even if the Co-Trustees and Elaine took this action while litigation was pending and on legal advice. Preston concludes that Elaine and the Co-Trustees had a duty to disclose the delegation of authority because the duty of disclosure exists independently of the rules of discovery, and applies even if no litigation exists between the trustees and the beneficiary. *See id.*

We reject this argument for two reasons. First, the record does not support Preston's proposition that that the Co-Trustees and Elaine had an agreement to delegate authority as Preston alleges. Second, *Huie* is distinguishable, as we discuss below. On the first point, Preston argues the documents are discoverable because the contemplated agreements, drafts or not, became effective. Preston asserts that a contract signed by only one party may still be effective, if one party signs and the other party accepts by her acts, conduct, or acquiescence in the terms of the contract. *See DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 44–45 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (holding that promissory note between the appellant and the appellee was a valid contract even though appellee did not sign it where appellee took possession of the note, acted on it, and did not object to any part of it). Preston claims that the Co-Trustees did not vote on distributions because they did not have the authority to vote but instead had ceded that authority to Elaine.

14

Preston argues that, because it is undisputed that he did not receive his distributions, the evidence that the Co-Trustees did not participate in any decision with regard to distribution establishes that Elaine exercised sole authority. Therefore, according to Preston, it is irrelevant that Elaine did not sign the documents.

Contracts require mutual assent to be enforceable. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam). Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind. *Id.* Although signatures and delivery are evidence of mutual assent required for a contract, they are not necessarily essential. *Phillips v. Carlton Energy Grp. LLC*, 475 S.W.3d 265, 277 (Tex. 2015). "[A] contract need not be signed to be 'executed' unless the parties explicitly require signatures as a condition of mutual assent. If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his unconditional assent thereto, there is a written contract." *Id.* (internal quotations marks and citations omitted).

Without agreeing or disagreeing with Preston's premise that the documents are discoverable—in the context of the present fiduciary litigation—if they became effective agreements, Preston's assertion that the Co-Trustees and Elaine entered valid agreements without Elaine's signature is not supported by the evidence. The testimony of Johnson, Aucoin, and Thompson do not establish that valid, binding agreements on the accumulation and distribution of funds exist. Johnson may have signed a proposed document, but the record and the documents we have reviewed in camera do not reflect that all parties to any purported agreement expressed their unconditional assent to a proposal by means of a signature or otherwise. The

15

testimony of the Co-Trustees cited by Preston shows only that no vote was taken. Their testimony does not suggest beyond speculation that Elaine had sole discretion to make decisions on the accumulation and distribution of funds, much less that the Co-Trustees and Elaine had entered into any such agreement. There is nothing in the record to indicate that Elaine acted on the purported agreements such that she assented to the terms without her signature.

Separately, *Huie* does not support piercing the privilege in this case. In *Huie*, the court considered whether the attorney-client privilege protects communications between a trustee and his or her attorney relating to the administration of a trust from discovery by a trust beneficiary. *Huie*, 922 S.W.2d at 921. There, a trust beneficiary sued the trustee, alleging that he had mismanaged the trust, engaged in self-dealing, diverted business opportunities from the trust, and commingled and converted trust property. *Id.* at 922. The beneficiary noticed the deposition of the trustee's attorney, who appeared but refused to answer questions about the management and business dealings of the trust. *Id.* After an evidentiary hearing, the trial court held that the attorney-client privilege did not prevent the beneficiary from discovering the attorney's pre-lawsuit communications. *Id.*

The court in *Huie* observed that trustees "owe beneficiaries 'a fiduciary duty of full disclosure of all material facts known to them that might affect [the beneficiaries'] rights.'" *Id.* at 923. (quoting *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984)). Furthermore, this duty exists independently of the rules of discovery and applies even if no litigious dispute exists between the trustee and beneficiaries. *Id.* While the attorney-client privilege protects confidential

16

communications between a client and the attorney made for the purpose of facilitating the rendition of professional legal services to the client, a person cannot cloak a material fact with the attorney-client privilege merely by communicating it to an attorney.  *Id.*  The *Huie* court illustrated the point with the following hypothetical:

> Assume that a trustee who has misappropriated money from a trust confidentially reveals this fact to his or her attorney for the purpose of obtaining legal advice.  The trustee, when asked at trial whether he or she misappropriated money, cannot claim the attorney-client privilege.  The act of misappropriation is a material fact of which the trustee has knowledge independently of the communication.  The trustee must therefore disclose the fact (assuming no other privilege applies), even though the trustee confidentially conveyed the fact to the attorney.  However, because the attorney's only knowledge of the misappropriation is through the confidential communication, the attorney cannot be called on to reveal this information.

*Id.*

Nonetheless, the court flatly rejected the beneficiary's argument that a trustee's duty of disclosure extends to any and every communication between the trustee and his attorney.  *Id.*  The court explained that (1) its holding did not affect the trustee's duty to disclose all material facts and to provide a trust accounting to the beneficiary, even as to information conveyed to the attorney; (2) the beneficiary could depose the attorney and question him about his handling of trust property and other factual matters involving the trust; and (3) the attorney-client privilege did not bar the attorney from testifying about factual matters involving the trust, so long as he was not called on to reveal confidential attorney-client communications.  *Id.*

17

Although a trustee owes a duty to a trust beneficiary, the trustee in *Huie* did not retain the attorney to represent the beneficiary but to represent himself in carrying out his fiduciary duties. *Id.* at 925. Contrary to Preston's point, the *Huie* court recognized that communications between a trustee and the trustee's attorney made confidentially and for the purpose of facilitating legal services remain protected. *Id.* at 923-24. The hypothetical in *Huie* involved the trustee's misappropriation of trust funds, which he revealed to his attorney for purpose of obtaining legal advice. *Id.* at 923. The trustee's misappropriation was a material fact of which the trustee knew independent of the communication. *Id.*

In contrast to the circumstances in *Huie*, and as explained above, HHS and all the Co-Trustees had an attorney-client relationship at the relevant time, and any communications among HHS and their joint clients regarding the contents of the draft documents were made for the purpose of obtaining legal services from HHS, and the Co-Trustees' knowledge of the draft documents was not gained independent of receiving legal advice. Accepting Preston's view of the discoverability of the subject documents would strip the attorney-client privilege and joint-client doctrine of their core purpose and meaning. Therefore, relators had no duty under *Huie* to disclose the draft documents to Preston.

### 3. *The joint clients did not waive the attorney-client privilege*

Preston asserts that Johnson waived any privilege by testifying about the draft documents at deposition without objection. Discovery privileges are waived by voluntary disclosure by the holder of the privilege. *In re Ford Motor Co.*, 211 S.W.3d 295, 301 (Tex. 2006) (orig. proceeding) (per curiam). A person waives his

18

privilege if he voluntarily discloses any significant part of the privileged matter unless such disclosure is privileged. Tex. R. Evid. 511(a)(1). In other words, Rule 511(a) "allows a partial disclosure of privileged material to result in an implied waiver of the privilege as to additional material that has not been disclosed." *Berger v. Lang*, 976 S.W.2d 833, 837 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (quoting *Terrell State Hosp. of Tex. Dep't of Mental Health & Mental Retardation v. Ashworth*, 794 S.W.2d 937, 940 (Tex. App.—Dallas 1990, orig. proceeding)). "This implied waiver occurs only if the disclosure is of any significant part of the privileged material." *Id.* (internal quotation marks & citation omitted).

Preston relies on the Dallas Court of Appeals' opinion in *Ashworth* in support of his position that any privilege was waived by Johnson's testimony. Preston's reliance on that case is misplaced. In *Ashworth*, the staff of a state hospital met following a suicide by a young patient to determine if anything could be learned to prevent similar events in the future. *See Ashworth*, 794 S.W.2d at 939. The meeting resulted in a "psychological autopsy," which consisted of a verbatim transcript of the meeting and a summary conclusion. *Id.* The hospital committee privilege protects information generated by a hospital committee in its investigation and review process and extends to committee meeting minutes and recommendations. *Id.*

A state senator sent a list of questions to the hospital's superintendent, who responded to the questions in a letter. *Id.* The superintendent's response to the senator included information and conclusions in the psychological autopsy, and the trial court could have concluded that the superintendent reviewed the psychological

19

autopsy in responding to the senator's questions and thereby disclosed significant portions of the report. *Id.* at 940–41.

Here, Johnson's testimony shows that he was not certain about the purported agreement to allow Elaine to make decisions about the accumulation and distribution of trust funds. Johnson testified that (1) one of the areas in which Elaine had sole discretion "might have been accumulation"; (2) he believed that Elaine had sole discretion on that issue "for a period of time"; (3) he "believe[d] [that information] was in a document"; and (4) he "believed we executed a document related to that effect[.]" There was no definitive testimony by Johnson on the issue. Johnson's equivocal testimony did not disclose details of the purported agreement or rise to the level of the disclosure of the report in *Ashworth*. The privilege was not waived by Johnson's testimony.

For the above reasons, we conclude that the trial court abused its discretion by overruling relators' privilege objections and compelling them to produce privileged documents responsive to the quoted requests for production, including the documents submitted in camera.

## B. No Adequate Remedy on Ordinary Appeal

Having concluded that relators established the trial court's abuse of discretion, we must determine whether they have an adequate remedy by ordinary appeal. A relator does not have an adequate remedy by appeal when the trial court erroneously orders the production of privileged documents. *Silver*, 540 S.W.3d at 538. We hold that relators do not have an adequate remedy by appeal because the error in ordering

20

the production of privileged documents cannot be cured on appeal. Therefore, conditional issuance of the writ of mandamus is appropriate.

## IV. Conclusion

We conditionally grant relators' petition for writ of mandamus and order the trial court to vacate its May 2, 2019 order. The writ will issue only if the trial court fails to act in accordance with this opinion. We lift the stay issued on June 22, 2018.

/s/    Frances Bourliot
       Justice

Panel consists of Justices Wise, Jewell, and Bourliot.